OPINION.
Appellant, The Schoenling Brewing Company, a.k.a. Royal Brewing L.L.C. ("Royal"), asserts in its sole assignment of error that the trial court was incorrect in applying the Ohio Alcoholic Beverages Franchise Act[2]
("the Franchise Act") in determining that Royal had breached its distributor agreement with the appellee, Z S Distributors, Inc. Z S contends that the trial court did not rely on the Franchise Act in making its decision.
Although it appears from the assignment of error that we are only being asked in this case to decide whether the Franchise Act applies to an out-of-state distributor of alcoholic beverages, the assignment is misleading. Addressing the assignment in its literal form, we conclude that R.C. 1333.82, by its unambiguous language, does not apply to out-of-state distributors of alcoholic beverages, because it defines a distributor as one who "sells or distributes alcoholic beverages to retail permit holders in the state* * *."[3]
But this conclusion, standing alone, does little to resolve the controversy between the parties. Because the trial court's written decision is a tad unclear, our conclusion is only the beginning of the analysis necessary to resolve the issues in the underlying case.
I. The Agreement
In May 1999, Royal Brewing purchased the assets of the Schoenling Brewing Company. Schoenling and Royal are both Ohio companies, and Z S is a Kentucky company that distributes alcoholic beverages only within Kentucky. Three years before the asset sale, Schoenling and Z S had signed a distributor agreement that allowed Z S to distribute certain brands of Schoenling's beer within a geographic sales territory consisting of seven Kentucky counties.
The distributor agreement, consisting of several pages and containing numerous paragraphs, had been drafted by Schoenling. Pertinent to our analysis are the paragraphs that (1) required Z S to obtain written consent from Royal for any transfer of twenty percent or more of the Z 
S business; (2) required either party to provide a ninety-day written notice before termination of the agreement; (3) provided examples of what constituted just cause for termination; and (4) required notice to be given if a correctible form of just cause existed, and allowed a ninety-day opportunity to make the necessary corrections.
In addition to those four provisions, the agreement also contained the following paragraph, which only a lawyer could write:
 It is mutually agreed that this Agreement shall be Conclusively deemed to have been executed under and pursuant to the laws of the State of Ohio, and that the laws of said state, and only said state, shall be applied hereunder, except for the existence of any conflicting provisions of said law will determine the statutory and regulatory authority of the agreement. Furthermore, it is mutually agreed that any causes of action between the parties hereto shall have jurisdiction and venue in the Courts of the State of Ohio in and for the county of Hamilton, except for the existence of conflicting provisions of Kentucky law. No right of actions exist for the Distributor, if Schoenling has fully complied with the statutory and regulatory provisions of any applicable Ohio law, and with the provisions of any applicable Kentucky laws or regulations.
 If that paragraph were not confusing enough, two other paragraphs specifically stated that Kentucky law could be applied, implying that Ohio law was not necessarily the exclusive law governing the parties' agreement.
 II. The Termination
A short time after the asset purchase, Royal orally informed Z S that it was terminating the distributor agreement. Before this oral announcement, there had been no notice of deficiencies to Z S. Five days later, Z 
S received written notice of the termination. The written notice failed to mention any deficiencies on the part of Z S. Instead, Royal's notice expressed its intent to consolidate its distribution network. It was not until Royal answered Z S's interrogatories that it provided any alternative reason for termination of the distributor agreement. At that point, it answered that Z S's decreasing sales were one factor that it had considered in deciding to cancel the agreement.
In its initial complaint, Z S did not claim any violation of the Franchise Act. Ironically, Royal first raised the issue in its motion to dissolve a temporary restraining order. In its motion, Royal argued that Z 
S was foreclosed from bringing an action against it because of the paragraph in the agreement that said, "No right of actions exist for the Distributor if Schoenling has fully complied with the statutory and regulatory provisions of any applicable law." It claimed that it had not violated any Kentucky laws and that it could not have violated any Ohio laws because there were no applicable Ohio laws. It specifically contended that the Franchise Act was inapplicable.
III. The Trial Court's Decision
The case was tried to the bench. The court asked the parties to file post-trial briefs regarding the applicability of the Franchise Act. In its decision for Z S, the trial court stated the following:
 The initial question for this court to determine is the applicability of the [Franchise Act]. Z S contends that these sections apply in this case, and Royal asserts they do not. Since these code sections provide very specific protections for distributors, no result can be reached in this case without first considering the applicability of these sections.
* * *
 Unfortunately, there does not appear to be any definitive case authority on whether [the Franchise Act] applies to distributors who buy from Ohio manufacturers but who have franchises to sell to retailers out of state.
 Despite its earlier determination that resolution of the case depended on whether the Franchise Act applied, the trial court ultimately believed that it could determine the case without reaching the issue of whether the Franchise Act applied to an out-of-state distributor. The court reasoned that because the distributor agreement contained a provision that Ohio law would apply, the parties intended to treat Z S as an Ohio distributor, "entitled to all the protections" afforded under the Franchise Act. In a subsequent opinion on prejudgment interest, the trial court again asserted that the case was decided on the terms of the contract and not on the Franchise Act, but again restated its language regarding Z S being treated as an Ohio distributor. We now hope to clarify this confusing decision.
The trial court's reasoning can be examined in three parts: (1) whether the Franchise Act was applied, (2) consideration of the agreement's choice-of-law provision, and (3) whether Royal failed to give proper notice of termination.
A. The Trial Court Applied the Franchise Act
 First, the trial court did apply the Franchise Act. The trial courtdecided that the Ohio choice-of-law clause in the distributor agreementwas ambiguous as to whether the parties intended for Z S to be treatedas an Ohio distributor. Consequently, it construed the agreement againstSchoenling, the drafter, and decided that Z S should be treated as anOhio distributor "entitled to all the protections of [the FranchiseAct]."
 The definition of "distributor" in the Franchise Act states that itonly applies to persons who sell to retailers located "in the state."[4]In contrast, the definition of "manufacturer" includes any person"whether located in this state or elsewhere."[5] The "or elsewhere"portion of this definition indicates that the legislators thought aboutout-of-state parties and specifically chose to exclude them from thedefinition of "distributor." Further, when a statute is unambiguous anddefinite, it must be applied as written,[6] and a court can neitherdelete words nor insert words not used.[7] Without discussing theconstitutionality of attempting to apply the Franchise Act to anout-of-state distributor, we simply conclude that the legislature meantto limit the Franchise Act to in-state distributors. It is undisputedthat Z S operates completely outside of Ohio.
 Therefore, this court refuses to adopt the trial court's interpretationthat the distributor agreement "incorporated" the Franchise Act. ChoosingOhio law does not constitute a waiver of out-of-state status. Thechoice-of-law provision does not create an ambiguity making applicable astatute that, by its terms, is inapplicable.
 Additionally, the existence of multiple provisions in the agreementconcerning Kentucky law indicates that the parties did not intend to haveZ S treated as an Ohio distributor; otherwise, those Kentucky lawprovisions would have been unnecessary.
B. The No-Right-of-Action Clause
Although the trial court did not specifically address the last sentence in the choice-of-law provision, Royal raised the issue below. One of the primary reasons that it argued that the Franchise Act did not apply was because of its interpretation of the following: "No right of actions exists for the Distributor, if Schoenling has fully complied with the statutory and regulatory provisions of any applicable Ohio law, and with the provision of any applicable Kentucky laws or regulations." Thus, according to Royal, because the Franchise Act did not apply, it did not violate any Ohio laws, and Z S was foreclosed from suing for breach of the distributor agreement.
We believe that this is an unreasonable interpretation of the provision. Royal's interpretation would negate any breach-of-contract claim, rendering the remaining provisions virtually meaningless. Because the sentence is contained in the provision specifically relating to "the statutory and regulatory authority of [the] agreement," it is more reasonable to interpret "no right of actions" as foreclosing the distributor from bringing suits based on damages somehow related to statutory or regulatory matters, e.g., a derivative tort action alleging defective bottling, and not based on the terms of the agreement.
If the provision were enforceable according to Royal's interpretation, then it would seem that one party, Z S, would have been bound by the terms of this agreement while the other party, Royal, would have only been bound to comply with statutory and regulatory requirements imposed by governmental entities-something it had to do anyway and involved conduct over which Z S had no control. If the only act for which Royal could be held liable under the contract were a failure to comply with statutory and regulatory mandates, of what consequence would the remaining provisions be? For example, why would Royal ever have had to give notice of termination or to repurchase Z S's inventory upon termination?
The intention of the parties appears to provide Z S with rights against Royal in the event of a breach. This intention is evidenced most clearly by the separate provision calling for a mandatory ninety-day notice by either party prior to termination. Conversely, the "no rights of action" provision was only a small portion of a much bigger choice-of-law clause. The parties' intention is shown by the attention and detail assigned in the agreement to the provisions for termination applicable to both parties.
Other aspects of the "no rights of action" provision are bothersome as well. Anytime one party is bound to a contract that the other party is free to breach, the issues of mutuality and conscionability can be raised. In this case, we do not examine such issues because we conclude that the provision has a limited effect.
C. The Breach
The trial court determined that Royal had breached the contract by not giving proper notice of termination. But not all terminations of the contract required a ninety-day notice. In the agreement, there were two separate provisions regarding termination. The first allowed for a termination with a ninety-day notice. The second provision stated that the agreement could be terminated for "just cause." Several instances of just cause were specifically included in the agreement. The next provision read that if a just-cause reason were correctible, then the defaulting party had to receive specific notice of the problem and then had ninety days to correct it. These unambiguous provisions must be read individually.
At trial, Royal claimed that Z S had breached the agreement in the following two respects, thus excusing its alleged breach: (1) Z S had transferred over twenty percent of its ownership, and (2) Z S had experienced declining sales in the months leading up to the termination of the contract. As to the first alleged breach, we agree with the trial court that, if there had been a breach, it was not material. The evidence demonstrated that Z S had sent notice of the transfer to Royal, but that Royal had failed to acknowledge it. Further, while declining sales were just cause for termination, there was no evidence that this was not correctible. The agreement required Royal to notify Z S of the reason for termination and to give it ninety days to correct the problem. Because it failed to do so, Royal, and not Z S, breached the agreement.
Thus, while we disagree with the majority of the trial court's analysis, we agree with its conclusion that Royal breached its contract with Z S. It is axiomatic that a trial court can be right for the wrong reason.[8] This is one of those cases.
III. Damages
The final step in our analysis concerns the trial court's determination of damages. The record shows that the trial court sought to determine how damages were calculated in the industry in situations similar to this case. In doing so, it apparently determined that the more credible evidence supported its conclusion that the industry standard for the breach of a distributor agreement was one year's gross profits. On the basis of this record, we agree. Evidence before the trial court included testimony from John Zemboldt, one of Z S's owners, as to the damages, as well as examples of what another beer manufacturer had paid Z S as a result of its removal of two products that Z S had distributed for it. In contrast, Frank J. Cento, a then-potential purchaser and employee of Z S, provided in his deposition calculations in response to specific questions posed by Royal as to profit margins. Cento also testified that he was not very familiar with the industry. There was also evidence that Royal had paid one year's gross profits to other Ohio distributors. (These parties seemed to have been paid, however, in compliance with the damages required under the Franchise Act.)
While, were the record different, we could certainly suggest better methods to calculate damages in this case, in this situation the evidence supports the trial court's conclusion. Thus, while Royal is correct in its view of the law as it attempts to limit its assignment of error, that conclusion is of no benefit to Royal, because we conclude that Royal breached the distributor agreement and that Z S was entitled to one year's gross profits as calculated by the trial court. Thus, we affirm the trial court's judgment.
Judgment affirmed.
Gorman, P.J., and Shannon, J., concur.
Raymond E. Shannon, retired, of the First Appellate District, sitting by assignment.
Please Note:
The court has recorded its own entry on the date of the release of this Opinion.
[2] R.C. 1333.82 through R.C. 1333.87.
[3] R.C. 1333.82(C).
[4] R.C. 1333.82(C).
[5] R.C. 1333.82(B).
[6] State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn. (1996), 74 Ohio St.3d 543, 545, 660 N.E.2d 463, 465; SERB v. Perkins
(June 22, 2001), Hamilton App. No. C-000759, unreported.
[7] See Bernardini v. Bd. of Edn. for Conneaut Area City School Dist. (1979), 58 Ohio St.2d 1, 4, 387 N.E.2d 1222, 1224; SERB v. Perkins,supra.
[8] See Este Oils Co. v. Federated Ins. Co. (1999), 132 Ohio App.3d 194,198, 724 N.E.2d 854, 857.